FREDERICKA. HOMBERG WICKER, Judge.
1 ^Defendant Terrol Cole appeals his conviction for second degree murder in violation of La. R.S. 14:30.1, alleging that the evidence presented at trial was insufficient to support his conviction for second degree murder and assigning error to the trial court’s rulings permitting a witness to read from a written statement during her testimony and permitting an assistant district attorney to allege facts during closing arguments that had not been established by the evidence admitted during the trial. For the following reasons, we affirm defendant’s conviction.

Procedural History

On June 17, 2010, a Grand Jury returned a true bill of indictment charging defendant with second degree murder.[1] At his June 21, 2010 arraignment, Isdefendant pled not guilty to the charged offense. On August-19, 2014, trial commenced before a .twelve-person jury.
During the trial, the State called numerous fact and expert witnesses. Among the fáct witnesses- were three women who testified that they were present during material events leading up to, during, and after the alleged' offense. These' three witnesses were Rhonda Skinner, Katrice Batiste, and Tanisha Stamps. The State also called several expert witnesses representing various cellular phone service providers to testify as to the timing and location of phone calls exchanged among defendant, the victim, and, other witnesses.
" On August 22, 2014, the jury returned a verdict finding defendant guilty of second degree murder, with ten of the twelve jurors voting in favor of the verdict. On September 4, 2014, the trial court sentenced defendant to life imprisonment without benefit of probation, parole, or suspension of sentence.[2] Defendant’s timely appeal followed.

Facts

On January 29, 2010, Donald Bates was murdered in his home at 2217 Eastmere Street in the' Woodmere neighborhood of Harvey, Louisiana. At trial, Carolyn Bates, the victim’s wife, testified that she returned to the couple’s shared home from *1196 work at approximately 3:00 p.m. to find her husband’s van gone and the front door of the residence ajar. Upon entering the home, Ms; Bates saw blood on the floor of the entry hallway, closet doors open, and sofa pillows tossed aside. The blood and disorder within the entryway to the home prompted Ms. Bates to exit -and have a friend call police to the home. •
Jefferson Parish Sheriffs Office’s deputy Jeffrey Easterly responded to the 9-1-1 call along with another deputy. Deputy Easterly testified that, upon entering |4the home, the two deputies observed blood on the floor and walls of the hallway, along with a used bullet casing and a live round on the floor of the hallway. The two officers proceeded further into the residence where they observed blood in the entrance to a bedroom, and in a bathroom within this bedroom, the officers discovered the victim’s body. Doctor Susan Garcia, a forensic pathologist with the Jefferson Parish Forensic Center, performed an autop'sy o,f the victim the following day and testified that the cause of the victim’s death was a lethal gunshot through his heart and lung. Doctor Garcia also testified that the victim was shot at least three times and that there was evidence of blunt force trauma present on the victim’s body, indicating a struggle took place prior to the victim’s death. Sergeant Gary Barteet with the Jefferson Parish Sheriffs Office homicide division was the scene detective responsible for documenting the scene of the crime. Sergeant Barteet testified that lying on top of the victim’s body was a pillow .with a bullet hole through it, as if the shooter had attempted to muffle the sound of a gun with the pillow, and that the entire home was in disarray, suggesting that someone had been looking for something within the home.
Police officers investigating the murder obtained the victim’s cell phone records to determine who had communicated with the victim prior to his death. Detective Solomon Burke, the lead investigator on this case, testified that the cell phone records showed that the victim received his last phone call around 8:53 a.m. the morning of his death and that the call was from Rhonda Skinner. Detective Burke was able to contact the phone company and track the location of Skinner’s phone to the- Siesta Motel in Marrero, Louisiana. Sometime after midnight following the murder, officers went to the motel and secured Skinner and her companion, Kenneth Devore, in their motel room. Skinner later admitted that she |awas alerted to the police officers’ presence at the motel and flushed her phone’s SIM card down the toilet in an attempt to avoid being located.
Detective Burke and other officers interviewed Skinner many times over the course of approximately one and a half to two days following her arrest. Detective Burke testified that initially Skinner gave investigating officers false information concerning the crime. Skinner also admitted during her testimony that she lied to police officers early in the investigation to protect other individuals involved in,the crime, but that after police- officers began catching her. in her lies she told the officers the truth. ■ .
Skinner testified that she had been friends with the victim for approximately two years prior to his death. On January 28, 2010, the day before the murder, Skinner accompanied the victim in his van to a check cashing business where the victim cashed a check for $12,500 he had obtained from the sale of his Cadillac. After accompanying the victim on several errands to pay off debts and purchase narcotics, the victim dropped Skinner off at her apartment building. Before' departing from *1197 Skinner, the victim, instructed her to call him.after his wife left for work at 5:30 or 6:00 the next morning. Skinner testified that .the next morning she participated.in several phone calls with Kenneth Devore, her boyfriend, Darnell Turner, and defendant, to discuss robbing the victim of his recently acquired money. Skinner testified that, at the time of the crime, she had known Turner for a couple of months and defendant for most of his life.
Later that morning, defendant, along with Darnell Turner, Tanisha Stamps, and Katrice Batiste picked up Skinner in Batiste’s car. After dropping off Tanisha Stamps at Turner’s residence on Destre-han Avenue in Harvey, Louisiana, the remaining occupants of the vehicle travelled to the Woodmere neighborhood, where the victim had told Skinner he lived, to search for the victim’s van in order | fito locate his residence. After locating and identifying the victim’s van parked outside of his home, defendant and Turner exited the vehicle at a nearby intersection and approached the house to rob the victim. Skinner testified that the plan was for defendant and Turner to knock on the door, speak with the victim, and try to find the money within the house, but that murder was never part óf their plan.
Skinner and Batiste remained in Batiste’s car and returned to Turner’s residence. on Destrehan- Avenue where they picked up Tanisha Stamps. . Shortly.after arriving at the Destrehan residence, Ka-trice Batiste received a phone call from defendant instructing them to meet him at his father’s residence on Marine Street in Marrero. Skinner testified that when she arrived at -the residence; she entered a room in the back of the house, where she noticed that defendant was sweating and wearing different clothes than he had been wearing earlier that day. She also testified that she noticed a black garbage bag in the same room containing a latex glove turned inside out. Skinner asked defendant what happened and he told her that when they attempted to rob the victim, Turner pulled out a gun and the victim charged Turner and struggled with him for the gun, so défendant had to “pop him with a gun.” Defendant gave Skinner and Turner $900 each and kept $1,000 from the robbery. Tanisha Stamps and Katrice Batiste also'testified that while'at this residence Batiste attempted to lie down on a sofa and burnt her head on a hot gun lying on the arm of the sofa. Before departing from the Marine Street residence with Batiste, Turner, Skinner, and Stamps, defendant placed a black garbage bag in the trunk of Batiste’s car. The group then made a short stop at defendant’s mother’s house so that defendant could get a pair of shoes before dropping off Skinner at her home.
|7Petective Burke testified that when officers recovered the victim’s van, which was discovered on fire a couple of blocks away from Turner’s Marine Street home on the day of the-murder, they discovered,among other things, two pairs of burned shoes.
At some point in the days following the murdqr, defendant, Turner,.. Batiste, and Stamps travelled to Little Rock, Arkansas, in Batiste’s car, where they stayed in various hotels for a few days. During the trip to Little Rock, Tanisha Stamps testified that she witnessed defendant carrying a gun on his person, though she did not know if the gun was the same one upon which Batiste had burned her head while lying on the sofa in the Marine. Street residence. Batiste testified that. while staying in a Little Rock hotel, she asked *1198 defendant what it meant when a gun was hot. Batiste testified that defendant did not go into detail, but that he replied that “it was hot because it had been shot”-and that “he put the pillow over his face and hit it five times.”
At some point thereafter, Batiste and Stamps departed Little Rock without defendant and Turner. .The two women were arrested in Mississippi,, where Detective Burke, interviewed them. Both Batiste and Stamps gave police officers statements implicating defendant in the murder and both positively identified defendant in a photographic lineup.
Defendant and Turner were also1 arrested at some point after splitting ways with Batiste and Stamps. Detective Burke interviewed defendant while he was incarcerated in an Arkansas jail. During that interview, defendant told the detective that he was in Baton Rouge on the day .of the murder and identified several individuals who could confirm his alibi. Detective Burke followed up with defendant’s alibi, but he was unable to find any witnesses who could corroborate defendant’s alibi, including defendant’s wife and his girlfriend.
[ ^Discussion and Analysis
In his first assignment of error, defendant argues that the evidence presented at trial was insufficient to sustain his conviction for second degree murder. Specifically, defendant asserts that the testimony from witnesses, Rhonda Skinner, Katrice Batiste, and Tanisha Stamps, was self-serving and inconsistent to such an extent that no rational trier of fact could find beyond a reasonable doubt that defendant was party to the charged offense. Defendant further argues that the lack of any physical evidence, i.e., fingerprint or DNA samples matching defendant, also demonstrates that the evidence was insufficient. Lastly, defendant argues that the jury’s non-unaninlous verdict, supported by the votes of ten of the twelve jurors, is per se evidence that reasonable doubt exists as to whether he committed the charged offense.
In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier, of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).. Evidence may be direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833. All evidence, both direct and. circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208.
| aAn appellate court’s primary function is not to re-determine the defendant’s guilt or innocence in accordance with its appreciation of the facts and credibility of the witnesses. Rather, our function is to review the evidence in the light most favorable to the prosecution and de *1199 termine whether there is sufficient evidence to support the jury’s conclusion. State v. Banford, 94-888 (La.App. 5 Cir. 3/15/95), 653 So.2d 671, 677. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; ■ the credibility of the witnesses will not .be reweighed on appeal. State v. Workman, 14-559 (La.App. 5 Cir. 4/15/15), 170 So.3d 279, 289. When there is conflicting testimony about factual matters,-the resolution of which depends on a determination of credibility of the witnesses, this-is a matter of the weight of the evidence, not its sufficiency. State v. Brown, 01-41 (La.App. 5 Cir. 5/30/01), 788 So.2d 694, 701: “The Jackson standard does not serve as a vehicle for a reviewing court to 'second guess the rational credibility determinations of the fact finder at trial.” State v. Hotoph, 99-243 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045.
Furthermore, when a witness is impeached, this simply means the jury, as the trier of fact, is presented with evidence which it could consider and weigh in determining the credibility, or believability, of a witness. Simply because the witness may have been impeached by prior inconsistent statements does not mean that the jury is prohibited from believing anything said by the witness. The inconsistencies in the witness’s statements are one of any number of factors the jury weighs in determining whether or not to believe a witness’s trial testimony. Brown, 788 So.2d at 701.
Defendant asserts that the plea agreement in place between the State and Rhonda Skinner, requiring her testimony in exchange for a reduced sentence, and the fact that the State dropped charges against Tanisha Stamps and Katrice Batiste |1(1and compelled them to testify against' the defendant, undermined the credibility of all of these witnesses. Defendant also points to Rhonda Skinner’s prior inconsistent statements to police, Tanisha Stamps’ allegedly inaccurate testimony that it was not raining, on the day of the murder;, and Tanisha Stamps’ testimony regarding defendant possessing a gun, which she failed to mention prior to trial, as further evidence of the witnesses’ unreliability.
Rhonda Skinner, Tanisha Stamps, and Katrice Batiste were all called to testify at defendant’s trial, and defense counsel cross-examined each of these witnesses extensively. During Skinner’s testimony, counsel for the State began direct examination by focusing on the plea agreement between Ms. Skinner and the State. The testimony elicited by the State clearly demonstrated that the plea agreement in-centivized Skinner to testify, at- defendant’s trial in exchange for a reduced sentence. The State further. examined Skinner regarding her prior,-criminal-history and the prior inconsistent statements she gave to police investigating-the murder. On cross-examination, defense’ counsel questioned Skinner even further on the deal she made with the State in exchange for her testimony and her prior inconsistent statements to police officers.
Similarly, both Tanisha Stamps and Ka-trice Batiste testified that they were not in court'voluntarily, the State elicited testimony from each of them regarding their, criminal history, and Stamps admitted during cross-examination that she had not reported witnessing defendant carry a gun to Arkansas prior to trial/ The jury was also made aware of Stamps’allegedly unreliable memory when defense counsel elicited conflicting testimony from another witness *1200 that it was raining on -the day of the murder, contrary to Stamps’ testimony.
The record reflects that defendant had ample opportunity to cross-examine these witnesses, and the evidence discrediting the testimony of the' witnesses was Inthoroughly' presented to the jury by counsel for both parties. As the trier'1 of fact, the jury whs entitled to consider the evidence in weighing the credibility of each witness and decide whether to accept or reject all or part of his or her testimony. In returning a guilty verdict, it appears that the jury found the witnesses sufficiently credible to sustain a conviction of second degree murder. Because the jury was in the best position to evaluate the credibility of these witnesses, and it is not the function of a reviewing court to second guess the jury’s credibility determination, we will not disturb the jury’s discretion on appeal.
Defendant’s assignment of error as to the sufficiency of the evidence focuses primarily on the credibility of the witnesses. Nevertheless, we have reviewed the record to determine whether there was sufficient evidence to convince a rational trier of fact that all of the elements of second degree murder were proven beyond a reasonable doubt.
Under La. R.S. 14:30.1, as it applies in defendant’s case, second degree murder is the “killing of a human being: ... [w]hen the offender is engaged in the perpetration or attempted perpetration of .,. armed robbery.” Armed robbery is the taking of anything of value belonging to, another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64.
At trial, Rhonda Skinner testified that defendant, along with Turner, entered the victim’s home with the intent to- steal $12,000 from the victim. Defendant told Skinner that he had to “pop” -the victim because he was struggling with Turner for Turner’s gun. Katrice Batiste testified that defendant told her he had shot a gun and that he had put a pillow over the victim’s face and “hit it five times.”-’ Skinner further testified that, after returning from the .victim’s house, • defendant gave her and Turner $900 each and kept $1,000 for himself. Investigating police officers | ^testified that the victim was involved in a struggle prior to being killed by a gunshot wound. Expert testimony regarding cell phone records corroborated the timing and events as established by the testimony of other witnesses. We find that this.evidence, when viewed in a light most favorable to the prosecution, was sufficient to convince a rational trier of fact that- defendant was principal to an armed robbery of the victim, during which defendant intentionally killed the victim.
Defendant’s assertion that there was. no evidence discovered at the scene matching his DNA or fingerprints does not alter our conclusion. Defendant does not cite, nor can this Court find, any authority suggesting that DNA and/or fingerprint evidence is necessary to convict a defendant of second., degree murder. To. the contrary, in a case where there is no physical evidence to link a defendant to the crime charged, the testimony of one witness, if believed by -the trier of fact, is sufficient support for a factual conclusion required for a verdict of guilty. State v. Marcantel, 00-1629 (La.4/3/02), 815 So.2d 50, 56; See also, State v. Page, 08-531 (La.App. 5 Cir. 11/10/09) 28 So.3d 442, 447-48, writ denied, 12-333 (La.5/25/12), 90 So.3d 410 (finding that witness testimony was sufficient .evidence to sustain a *1201 second degree murder conviction, despite the absence of any physical evidence -linking the defendant to the crime). -■ ,
Defendant’s remaining argument that the jury’s non-unanimous verdict demonstrates that the evidence was insufficient to convict him is similarly unpersuasive. La. Const. Art. I, § 17 and La. C.Cr.P. art. 782 require the concurrence of ten of twelve jurors to render a verdict in a case in which punishment is necessarily confinement at hard labor. Thus, when ten of twelve jurors conclude that the evidence presented at trial excludes .all. reasonable doubt of defendant’s guilt, the evidence is sufficient to sustain- a guilty verdict.. In | ^defendant’s case, the trial court instructed the jury on the State’s burden of proof. After return of the guilty verdict, the jury was polled and the trial court determined that ten of the. twelve jurors concurred to reach a guilty verdict. The existence -of reasonable doubt in the minds of two of the twelve jurors does not,render the evidence insufficient to support defendant’s conviction. The constitutional and statutory requirements were satisfied by the concurrence of ten of the twelve jurors.
Accordingly, we find that this assignment of error is without merit.

Defendant’s Second Assignment of Error

In his second assignment of error, defendant argues that the trial court erred in permitting Rhonda Skinner to read from a “Memorandum of Understanding” while testifying at trial, in violation of La. C.E. art. 612(B). At defendant’s trial, the State called Rhonda. Skinner to testify to the events surrounding the victim’s death. Skinner was originally charged as a principal to the victim’s murder in the same bill of indictment filed against defendant. After reaching a plea agreement with the State, Skinner was-severed from the indictment and pled to a reduced charge of conspiracy to commit armed robbery, obstruction of justice, and second degree battery, in exchange for her truthful testimony and cooperation with the State. The Memorandum of Understanding (hereinafter “the Memorandum”) memorialized Skinner’s agreement with the State and outlined Skinner’s prior criminal history, her prior inconsistent statements to police, and her participation in' the events surrounding the victim’s death.
At the outset of the State’s direct examination of Skinner, the prosecution provided Skinner with a copy of the Memorandum, asked her to review the Memorandum, and asked1 her to confirm that she initialed and dated each page of the Memorandum and signed and dated the-end of the Memorandum. Skinner | ^positively identified her initials' and signature on the Memorandum and confirmed that she agreed to testify to the events outlined in the Memorandum. On the State’s motion, the Memorandum was entered into evidence and published to the jury without objection from defense counsel, who also noted that the defense intended tp admit the. Memorandum as a joint exhibit. The jury was then given copies.of the Memorandum,to review during Skinner’s testimony.
The State continued questioning Skinner regarding the terms' of the agreement, which were memorialized within the Memorandum, and the circumstances surrounding her execution of the Memorandum. Throughout this preliminary portion of the State’s examination, the prosecution avoided questioning Skinner regarding the substantive facts of the case; rather,- the prosecution referenced the Memorandum to elicit testimony from Skinner about the *1202 details of her criminal history and the terms of the plea agreement, including provisions of the. Memorandum which obligated Skinner to testify truthfully and permitted the trial judge to impose a sentence based on his evaluation of Skinner’s veracity. , •
At this point, defense counsel objected to Skinner’s testimony on the grounds that Skinner “cannot have [the Memorandum] as a crutch throughout testimony and cross examination.” Defense counsel correctly argued that the Memorandum “basically lays out. factually what [the State] hope[s] that she will testify to, and to allow a witness who is such a witness in the case to read her testimony ... basically portions of „the transcript is completely improper.” The trial judge agreed, responding that, “it’s admitted, but she cannot have it on the stand to testify. She’s got to testify from her personal knowledge. She has not said that she needs to refresh her recollection....”
11BAfter the conclusion of the bench conference, the State resumed examination of Skinner, turning to the substantive facts of the case. During the remainder of her testimony, the record indicates that Skinner testified independently of the Memorandum. This is evident from the fact that Skinner’s testimony provided a more detailed account of the events than was contained within the Memorandum. Moreover, defense counsel never renewed his objection to Skinner’s reading during her testimony.
Upon our review of the record, we find no error in the trial court’s ruling. La. C.E. art. 612(B) provides, “In a criminal case, any writing, recording, or object may be used by a witness to refresh his memory while testifying. If a witness asserts that his memory is refreshed he must then testify from memory independent of the writing, recording, or object.” There is no evidence in this record that Skinner’s memory failed or required any refreshing. Therefore, there was no basis in this record upon which Skinner should have been presented with the Memorandum in order to refresh hér recollection. La. C.E. art. 612(B). However, the prosecution was permitted to question the witness upon the terms and conditions of her plea agreement. Therefore, the prosecution properly presented the Memorandum to the witness in order for her’to acknowledge that the Memorandum accurately reflected the terms and conditions of the plea agreement and that she had signed it. La. C.E. art. 901(B)(1); See also, State v. Austin, 12-629 (La.App. 5 Cir. 3/13/13), 113 So.3d 306, 316 (affirming the admissibility of documentary evidence and authentication of the evidence by witness testimony that the document was what it purported to be, pursuant to La. C.E. art. 901(B)(1)). As to the issue of the jury being permitted to read the Memorandum with its recitations of the witness’s expected testimony, the defense did not object and has l^not assigned error to this action. Therefore, that matter is not before us. U.R.C.A. Rule 1-3.
During the bench conference on defense counsel’s objection to the witness using the Memorandum as a crutch in her fact testimony, the trial court correctly ruled that Skinner was not permitted to read from the Memorandum while testifying. There is no evidence in the record, however, that Skinner continued reading from the Memorandum after the trial court sustained defense counsel’s initial objection. To the contrary, it appears that Skinner testified from her independent recollection of the events throughout the remainder of her testimony.
*1203 Nevertheless, it appears that the prosecution was confused regarding the appropriate use . trial counsel may make of a prior consistent statement. La. C.E. art. 612(B) does not authorize a witness in a criminal case to read from a writing while testifying. Talamo v. Shad, 619 So.2d 699, 701 (La.App. 4 Cir.1993). If a witness states that he or she cannot recall a fact, but a certain writing could help refresh the witness’s memory, the witness may look at the document and then testify from his revived memory. La. C.E. 612(B). However, when the witness has been permitted to consult a writing and it has not refreshed his or her memory to the extent that' he now has an independent recollection of the event in question, La. C.E. art. 612 does not authorize the witftess to read the writing into evidence. The purpose of La. C.E. art. 612 is to give a witness an opportunity to jog his memory so that he or she may testify from memory. Talamo, 619 So.2d at 701 (citing Author’s Note (1) to La. C.E. art. 612). It is possible that a witness may read a writing into evidence under the “recorded recollection” exception-to the hearsay rule, pursuant to La. C.E. art. 803(5), but for admission of such a writing, a foundation must be established showing, among other things, that the witness has insufficient recollection. State v. Woods, 619 So.2d 803, 805 (La.App. 1 Cir. 1993). In-this case, neither La. C.E. 612(B) nor La. C.E. 803(5) would have permitted Skinner to read from the Memorandum while testifying.
The trial court sustained defense counsel’s objection to Skinner reading during the initial portion of her testimony, and the record indicates that Skinner testified from her independent recollection of events during the remainder of her testimony. Accordingly, we find no merit in this assignment of error.

Defendant’s Third Assignment of Error

In his third'and final, assignment of error, defendant argues that the trial court erred in permitting the State to make statements during closing argument that were unsupported by the evidence admitted during trial. Specifically, defendant contends that the prosecutor’s closing argument speculated as to the content of phone calls between Darnell Turner and Rhonda Skinner that occurred shortly before the victim’s death. Defendant further contends that during the State’s closing argument, the prosecutor impermissibly stated an alleged reason for time‘periods during which there was no cel! phone activity shown in the cell phone records of Darnell Turner and defendant. Defendant argues that these portions of the State’s closing argument were not supported by any evidence, admitted during the trial.
The "pertinent portions of thé State’s closing argument are as follows:
The 6:14 a.m. call that was returned by Turner to speak is 805 seconds.... That’s how .this conspiracy started. That’s what Rhonda, Skinner told you. That’s them.setting up this man to his death. Here it is on both cell phone records... ⅛ After, the thirteen minute phone .call between ,Skinner and Turner it starts happening very quickly.... The crew’s plan’s in motion. This is a setup call with. Rhonda Skinner. They got to make sure, Donald Bates’ home [sic], 8:18 a.m.,- Rhonda Skinner is already in Woodmere, 8:53 a.m., the final setup call ... And 9:47 a.m. on the 29th of January, you know, this is Donald Bates’ last call. The last call in his records you can see .in front-of you. No more calls after this, 8:53 a.m. After that .he’s dead. This is Darnell Turner’s cell phone records. What you have., remember [sic ], *1204 8:58. a.m., is when Rhonda Skinner calls Donald Bates, 8:58 a.m., you | ishave the confirmation call between Rhonda Skinner, Darnell Turner, then it’s'on. You didn’t have a period of radio silence. This is important, this shows, we’re going to "over it a little bit, the preparation for this robbery. ' You have a period of radio silence and designated on Darnell Turner and Terrol Cole’s records is this dotted line. No communication whatsoever. You’re going to seé' latér no multi-pie phone calls—
At this point, defense counsel objected on the grounds that the State’s closing argument recounted facts not in evidence. The trial, court overruled the objection.
La. C.Cr.P. art. 774' confines the scope of argument to “evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to. the. law applicable to the case.” State Frank, 99-553 (La.5/22/07), 957 So.2d 724, 741. Nevertheless, prosecutors are permitted wide latitude in choosing closing argument tactics, and the trial judge has broad discretion in' controlling the scope of closing argument. State v. Legrand, 02-1462 (La.12/3/03), 864 So.2d 89, 101; State v. Flores, 14-642 (La.App. 5 Cir. 12/23/14), 167 'So.3d 801. Consequently, the State may permissibly make statements during closing arguments drawn from a range of reasonable conclusions from the facts in evidence. See, e.g., Id.; State v. Bretz, 394 So.2d 245, 246 (La.1981); State v. Clark, 387 So.2d 1124, 1131 (La.1980). Even if the prosecutor exceeds these bounds, a reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict. Frank, 957 So.2d at 741; See also State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, 200.
During defendant’s trial, Rhonda Skinner testified that on the morning of the murder she got a call from defendant and Darnell- Turner, the purpose of which was to discuss robbing the victim. Skinner further testified that after having the initial phone discussion regarding the robbery, she waited for defendant and Turner to pick her up. The State also presented expert testimony from several cell phone hsservice providers regarding the timing of calls among defendant, Turner, Skinner, and thé victim, and the location of the persons making and receiving those calls. The expert testimony established that several calls were placed between defendant, Turner, and Skinner on the morning of the murder, and that the last phone call the victim received was from Skinner at 8:53 a.m. on that same morning. The expert testimony further established that.no calls were recorded by the cell phone providers to or. from defendant’s cell phone between 7:37 a.m. and 10:32 a.m;, nor to or from Turner’s cell phone between 8:58 a.m. and 9:47 a.m, Each of the expert witnesses testifying to these cell phone records testified that'if a phone call was made to these phones while the phones- were turned off, the cell phone records would not reflect that phone call.
Upon review of the prosecutor’s closing argument! and the totality of evidence admitted at trial, we find that the prosecutor’s statements were within the range of reasonable conclusions drawn from the facts in evidence. Considering Ms. Skinner’s testimony, that her early phone discussion with defendant and. Turner concerned a plan to rob the victim, her testimony as to the subsequent events that occurred in preparation for the robbery, and- the expert testimony regarding -the phone calls that took place during this *1205 time,., the prosecutor was reasonable in concluding that the content of the phone calls to which he referred in closing arguments was related to planning the robbery.
We also find that the prosecutor’s statements regarding “radio silence” from defendant and Turner were supported by the evidence. The expert testimony regarding the cell phone records established, that there was no recorded activity to or from defendant or Turner’s cell phones during this time. While the expert testimony also established that a phone call made to the cell phones while turned off.would not have been recorded, .there is no evidence suggesting that this | ^occurred. Therefore the prosecutor was reasonable in concluding that there was no communication from or to defendant’s phone during this period of time.
Even assuming, arguendo, that the prosecutor’s statements were impermissible under La. C.Cr.P. art 774, defendant has not shown that the State’s argument influenced the jury and contributed to the verdict. The trial court instructed the jury prior to deliberations that the closing arguments made by attorneys are not to be considered as evidence and explained to the jury that “[i]n the closing arguments the attorneys are permitted to present for your consideration their contentions regarding what the evidence has shown or not shown and what conclusions they think may be drawn from the evidence.” Moreover, as discussed in our analysis of the sufficiency of the evidence,.the State presented ample evidence, apart from the State’s closing argument, to support defendant’s conviction.:
In determining whether admission of the allegedly impermissible statements constitutes reversible error, we -are obliged to “give credit to the good sense and fair-mindedness of the jury that has seen the evidence and heard the argument, and has been instructed that the arguments of counsel are not evidence.” Flores, 167 So.3d at 808. Under the facts and evidence presented in this case, we do not find that the prosecutor’s statements influenced the jury or contributed to the guilty verdict. Accordingly, we do not find that the trial court abused its broad discretion in controlling the scope of closing arguments.

Errors Patent

We have reviewed the record for errors patent in accordance with La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals a discrepancy between the commitment and transcript with, regard to the hard labor provision of |2i defendant’s sentence. Although the commitment reflects that defendant’s sentence was imposed at hard labor, the transcript does not reflect that the judge ordered the sentence be imposed at hard labor or provided that the sentence would be served with the Department of Corrections.
La. C.Cr.P. art. 879 requires a court to impose a determinate sentence. If the applicable sentencing statute allows discretion, the failure to indicate whether the sentence is to be served at hard labor is . an impermissible indeterminate sentence. State v. Norman, 05-794 (La.App. 5 Cir. 3/14/06), 926 So.2d 657, 661, writ denied, 06-1366 (La.1/12/07), 948 So.2d 145. Defendant was sentenced pursuant to La. R.S. 14:30.1, which mandates the sentence be served at hard labor. As such, the trial court’s.failure to state that the sentence was imposed at hard labor is harmless error and no corrective action is required. See Id.; State v. Dennis, 12-818 *1206 (La.App. 5 Cir. 5/16/13), 118 So.3d 1166, 1174, writ denied, 13-1384 (La.12/6/13), 129 So.3d 530.

Conclusion

Upon review of the record we find no merit in the defendant’s three assignments of error. Accordingly, we affirm his conviction and sentence.

AFFIRMED

. The bill of indictment also charged Rhonda M. Skinner with second degree murder and obstruction of justice. Ms. Skinner later entered into a plea agreément with the State to provide testimony against defendant in exchange for a reduced charge.

. At the sentencing hearing, the trial judge did not specify whether defendant’s imprisonment was to be served at hard labor. See Error Patent Discussion, infra.